UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GARRETT MARTIN,

          Petitioner,

  vs.

S. W. ORNOSKI, Warden,

          Respondent.

                                        /

No. C 06-1589 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted based on petitioner's five cognizable claims for relief. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has filed a traverse. For the reasons set out below, the petition is denied.

## BACKGROUND

On November 28, 2000, a jury convicted petitioner in Alameda County Superior Court of simple mayhem,[1] willfully inflicting corporal injury upon a cohabitant, and possessing a shotgun as a convicted felon. The jury also found true allegations that in inflicting corporal injury, petitioner personally used the shotgun that caused great bodily injury, and that he personally used the shotgun while committing mayhem. The jury was unable to reach a verdict on the sentence enhancement allegation that petitioner had personally and intentionally discharged the shotgun while committing mayhem, and that allegation was stricken. The trial court sentenced him to a term of eighteen years in state

---

[1] Petitioner was charged in Count One with aggravated mayhem, but the jury convicted him of the lesser-included offense of simple mayhem.

prison. Petitioner unsuccessfully appealed his conviction to the California Court of Appeal and the Supreme Court of California denied review. Petitioner has also filed several unsuccessful state habeas petitions.

Petitioner does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

> Martin and Rena F. met in the fall of 1998. In January 1999, they began living together, sharing a bedroom in the home of Martin's friend. The parties had a tumultuous relationship, and in early March of 1999, Rena F. went to Arizona for a few days to get away from Martin, but she called him and after the conversation decided to return.
>
> On the morning of March 23, 1999, Rena F. got dressed, intending to go to the store. She was wearing a leotard, leggings, socks, tennis shoes, and a jacket. While he was still in bed, Martin started to yell at Rena F., implying that she was leaving him again; Rena F. replied that she was just going to the store. They argued for over 15 minutes. At some point during the argument, Martin produced a 12-gauge shotgun. Now standing, Martin pointed the shotgun at Rena F.'s face and head as she sat on the bed; he said that Rena F. was not going to leave him again. Rena F. begged Martin not to shoot her; she put her hands in front of her face, inches from the barrel of the gun. Rena F. saw Martin's finger on the gun trigger, but she did not actually see Martin pull the trigger. She may have tried to push the shotgun barrel away before Martin shot her. Although she was not sure of the exact position of her hands when she heard the shotgun blast, afterwards, she saw that she had no "hands left." Martin was upset and he could have been crying; he said that he did not mean to shoot her; it was an accident and he did not know what happened. Rena F. asked Martin to call 911. He responded by saying, "look what I did to my baby," and left the room. When Martin returned, Rena F. asked if he had called an ambulance because she was "bleeding to death, and [she] was going into shock." Rena F. also asked Martin to get her a towel, which he did. After Rena F. again asked him, Martin called 911. While waiting for the ambulance, Martin said, "you know that it was an accident," numerous times. Before Rena F. went to the hospital, Martin told her to say that it was an accident. When the paramedics arrived, Rena F. Told them that the shooting was an accident.
>
> Alameda County Sheriff's Deputy Mark Foster responded to the 911 call. Standing in the doorway of the bedroom, Foster heard Martin speaking to someone on the telephone, stating that "my girlfriend shot herself. She needs help." Foster asked Martin to end the phone call, and then asked Martin where his girlfriend was and the location of the gun. Martin claimed he did not know where the gun was located. Foster found Rena F. lying on the bed and pleading for help. The officer saw that "her hands appeared to be blown off at the wrists. Her skin was basically at the base of the wrist, and her hands were blown apart with all the flesh and the fingers, everything, kind of fully blown up over the top of her forearms." The officer stated that it was "probably the worst thing I've seen happen to a human being. It was pretty gruesome." Blood was "everywhere," including the mattress and sheet underneath Rena F. and on her body and face. Appearing semi-conscious

and in "some type of shock," Rena F. told the officer that it was an accident. Foster repeatedly asked Martin about the gun, but Martin only replied, "help her." Subsequently, Martin told Deputy Frank Buschhueter that the gun was in the bedroom. The officer found the gun behind the head of the bed where it appeared to be partially concealed. Buschhueter believed that the gun could not have been tossed into its location.

Dr. Thomas Gonda, Jr., a trauma surgeon, treated Rena F. at Eden Hospital. Rena F. sustained significant damage to both hands, including multiple fractures, broken bones, severely lacerated skin, and the loss of a finger from her left hand. She subsequently lost two more fingers. Photographs of Rena F.'s hands taken on the day of the incident were admitted into evidence at trial. The vast majority of shotgun pellets had entered the palm side and gone through Rena F.'s hands. After passing though her hands, the pellets were deflected to other areas of her body, including her nose, chin, chest, and the immediate vicinity of her heart. According to Gonda, it appeared most likely that Rena F.'s hands were together and over her head, with the palms facing toward the muzzle when the shotgun discharged.

At the trial, the People began their presentation of evidence by calling as witnesses two of Martin's former domestic partners. Karen M., the mother of Martin's son, described two incidents of abuse. The first incident occurred in November or December of 1994 while she and Martin were living together. During an argument, Martin slapped Karen M. in the face and then threatened her by pointing a gun at her and shooting over her head. Karen M. did not report the gun incident to the police, but she subsequently left Martin in August of 1995 because she had had enough of his threats. The second incident occurred in 1996 at the home where Karen M. then lived with Martin's son. One evening, at about 10 p.m., Martin arrived unannounced and began ringing the buzzer asking to visit his son. Karen M. refused to let him in because it was late and asked him to come back the next day. Martin responded by shouting through the intercom that he was going to blow up the building and that he would "get" her at work. She called the police that night and later got a restraining order against Martin.

Elayne F. testified that shortly after she met Martin in the fall of 1995, he moved into her apartment. She explained that after she "totaled" Martin's uninsured car in January 1996, their relationship went "downhill." She then described four incidents of abuse. During a ten-day period in March 1996, Elayne F. and Martin had two arguments in the apartment. During the first argument, Martin hit Elayne F. several times and held her upside down over the second floor apartment's balcony railing, threatening to drop her. He also claimed that he was a member of a gang and could have her killed. On the second occasion, Martin produced a gun, placed it at her forehead and told her that he could kill her. During a third incident on March 24, Martin became angry because Elayne F. was talking on the telephone to a neighbor. Elayne F. ran out of the apartment, but Martin grabbed her by her hair and hit and kicked her several times as he dragged her back into the apartment. Photographs of her injuries were admitted into evidence. Inside the apartment, Martin continued to hit her. She fled the apartment and ran to a neighbor's home, where she called the police. Martin was subsequently arrested. Prior to the preliminary hearing on the charges against Martin arising from the March 24th incident, Elayne F. received a call from a person

named Chris who told her not to tell the truth at the hearing. Frightened by the phone call and the presence of Martin and his relatives at the hearing, she denied he had attacked her. In an attempt to get away from Martin, Elayne F. moved to a new apartment without telling him her new address. However, on May 20, 1996, Martin confronted her in the parking lot of her new home. She retreated to her apartment, but Martin followed and attacked her, striking her several times and breaking her front tooth.

The remainder of the People's evidence related to the current charges against Martin. Rena F. described the shooting incident and its aftermath, testifying that she did not think the shooting was accidental. On cross-examination, she conceded that her trial testimony included details she recalled for the first time during trial, and that in her prior statements to the police and during questioning at an earlier preliminary hearing, she had indicated that the shooting was an accident. She further agreed, when examined by defense counsel, that before the police asked her about the incident, they told her the version Martin had already given them: that she had taken out the shotgun to use as a "sex toy," he had attempted to take the gun away from her, and that during the "tug of war" for the gun, it discharged. She denied, however, that she had told Martin's father she'd had hold of the gun, it slipped through her fingers, and the next thing she knew it went off.

During her testimony about her relationship with Martin, Rena F. described three prior incidents of domestic violence. On one occasion in the fall of 1998, he threw her "a good ten feet into a night stand," causing injury to her leg and knee. Rena F. did not get any treatment for her injury, nor did she call the police. After that incident she stopped seeing Martin, but she later reluctantly agreed to see him again. She described a second incident that occurred in November or December of 1998, when Martin struck her as she entered his home, knocking her unconscious. That time, Rena F. sustained bruises and a black eye. However, she did not seek any medical treatment for her injuries nor did she call the police. Rena F. described a third incident that occurred about a month before the shooting, during which Martin had forced her to submit to a painful sexual act against her will, causing her physical injury. She did not call the police regarding this last incident because she was "scared to death" of Martin.

Martin did not testify at trial. He did present witnesses in an attempt to challenge some aspects of Rena F.'s version of the shooting incident. Martin's next-door neighbor testified that before she heard the shotgun blast, she did not hear any yelling or raised voices at Martin's house. The neighbor did not think she had her television on before the shooting, but it was possible. She also indicated that she had a hearing problem. A paramedic technician testified that when he arrived at the scene Rena F. appeared to be dressed in casual, skimpy clothing, "not something you'd wear outside of the home." He did not recall seeing anything like a sweater or jacket on Rena F.; to the best of his recollection, Rena F. was not wearing clothes that would be worn outside.

Additionally, Martin's father, Earl Martin, testified to a series of discussion he had with Rena F. regarding the shooting. Shortly after the shooting, Rena F. made several telephone calls to Earl. During those conversations, Rena F. asked Earl if Martin still wanted to be with her and would he continue to "want her with her hands like they were." Rena F.

4

> further stated that it was up to her whether Martin came home or went to jail for life, that she could not make a living because of her hands, and she implied that she might sue Earl. Rena F. also indicated that she thought she might have had her hands on the gun before it went off and she could not believe that Martin would shoot her. Subsequently, Rena F. went to Earl's home. At that time, Rena F. showed Earl her hands, and said "look what [he] did to me." Rena F. also stated that she had been invited to appear on television talk shows after the trial and she would "get . . . a good job out of the thing."

Resp. Ex. 22 at 1-6.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

## DISCUSSION

As grounds for federal habeas relief, petitioner asserts that: (1) the trial court's failure to give additional instructions on general intent violated his right to due process and to present a defense; (2) the prosecution failed to preserve exculpatory evidence; (3) there was prosecutorial misconduct; (4) there was jury misconduct; and (5) his appellate counsel was ineffective. There is a reasoned state court opinion by the California Court of Appeal with respect to the jury misconduct claim, which was raised on direct appeal. The remainder of these claims were raised in the state courts in state habeas petitions, which were summarily denied.

### I.    Jury Instructions

Petitioner claims that the jury instruction on general intent, pursuant to CALJIC No. 3.30 was deficient, and the trial court erred in denying petitioner's requests for additional, clarifying instructions on the issue. In particular, petitioner argues that the CALJIC No. 3.30 instruction did not adequately convey to the jury that general intent, as it applies to simple mayhem, a lesser-included offense of aggravated mayhem, required a finding that petitioner intended to fire the gun.

During deliberations, the jury sent the following requests to the trial judge: (1)

1  "Instruction 4.45 describes the commission of an act 'through misfortune or by accident
2  under circumstances that show neither criminal intent nor purpose.' What is the instruction
3  for the commission of an act 'by accident' under circumstances that *do show* criminal intent
4  or purpose?"; and (2) "If we are unanimous on the greater charge, but split on the lesser
5  charge, how do we report?" Clerk's Transcript (Respondent's Exs. 1-2) ("CT") at 399, 403.
6  After receiving the second request, the trial court instructed the jury pursuant to CALJIC
7  No. 17.12 on how to report on their decision on the lesser charge. Reporter's Transcript
8  (Respondent's Exs. 3-18) ("RT") at 1891-93. The trial court then allowed defense counsel
9  to make his argument on the record about the jury's requests. RT at 1894. Defense
10 counsel argued, as petitioner argues here, that the instruction pursuant to CALJIC No. 3.30
11 did not adequately convey to the jury that simple mayhem requires a showing of intent to
12 fire the gun, and he requested "a more specific instruction which makes it clear [] that the
13 general criminal intent necessary for simple mayhem and 273.5[2] is the intent to do the act
14 which is the crime." RT at 1894-95. The trial court denied the request, finding that the
15 instructions adequately explained the intent necessary for simple mayhem. RT at 1896.
16 Approximately an hour later, the jury notified the court that they were deadlocked as to the
17 simple mayhem charge; after the trial judge canvassed the jury on their view of reaching a
18 verdict with further deliberation, the jury resumed deliberations and two hours later returned
19 a unanimous verdict that petitioner was guilty of simple mayhem. CT at 403-409, RT at
20 1896-99.

21       Federal habeas relief is available when an a jury instruction so infects the trial that
22 the trial is rendered fundamentally unfair, in violation of petitioner's right to due process.
23 *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The instruction may not be judged in artificial
24 isolation, but must be considered in the context of the instructions as a whole and the trial
25 record. *Id.* In other words, the court must evaluate jury instructions in the context of the

---

[2]California Penal Code 273.5 sets forth the enhancement for "willful infliction of corporal injury" in connection with the the mayhem charge.

overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982). Moreover, it is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case. *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000)). Failure to instruct on the theory of defense violates due process if "'the theory is legally sound and evidence in the case makes it applicable.'" *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir.2006) (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)). However, the defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996). An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory. *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979). In other words, it allows a determination of whether what was given was so prejudicial as to infect the entire trial and so deny due process. *Id.*

An examination of the record in this case reveals that the instructions given properly informed the jury that simple mayhem is a general intent crime, and that in order to convict petitioner of the crime the jury would have to find that he intentionally fired the gun. The trial court issued the following instruction, pursuant to CALJIC No. 3.30:

> In the crimes and allegations charged in Counts Two and Three, namely willfully inflicting corporal injury resulting in a traumatic condition upon Rena Franklin, a person with whom defendant was cohabitating, and being in custody, possession or control of a firearm, having been previously convicted of a felony, and the crimes of simple mayhem, a violation of Penal Does Section 203, which is a lesser crime to the crime of aggravated mayhem, and the crime of battery, a lesser offense to willfully inflicting corporal injury resulting in a traumatic condition upon Rena Franklin, a person with whom he was cohabitating, there must exist a union or joint operation of acts or conduct and general criminal intent. General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful.

RT at 1865. The jury was elsewhere instructed that petitioner would be guilty of aggravated mayhem if he had the "specific intent permanently to disable, disfigure or

8

1 deprive the other person of a limb, organ, or member of her body." RT at 1869.  The
2 CALJIC No. 3.30 instruction clearly stated that the lesser include offense of simple
3 mayhem, by contrast, is a general intent crime.  The instruction further explained what that
4 means – that a person "intentionally does that which the law declares to be a crime." RT at
5 1865.  For purposes of the mayhem charge, "the law declares to be a crime" an act that
6 causes permanent damage to the victim.  In the context of this case, that act was firing the
7 gun.  Thus, when these instructions are read together, they plainly inform the jury that in
8 order to convict petitioner of simple mayhem, they would have to find that petitioner
9 intended to fire the gun, while aggravated mayhem would require a finding that he
10 specifically intended to cause the permanent damage to the victim that resulted from the
11 shooting.  Additional instructions, pursuant to CALJIC No. 4.45, also clearly informed the
12 jury that if accident negates criminal intent, meaning that if they found that petitioner fired
13 the gun by accident, he would not be guilty of simple or aggravated mayhem (or the
14 general intent charges).  RT at 1868.

15 Petitioner argues that the two jury requests indicated that the jury did not understand
16 the general intent instruction to require a finding that petitioner intentionally fired the gun in
17 order to convict him of simple mayhem.  The record does not support this argument.  The
18 first jury request concerned the accident instruction CALJIC No. 4.45, not the general intent
19 instruction pursuant to CALJIC No. 3.30.  While this request displayed some jury confusion
20 over what constituted an accident,[3] it did not address or raise the issue of the level of intent
21 necessary for a conviction on simple mayhem.  The second jury note indicated that the jury
22 did not know how to report their verdict if they were "unanimous on the greater charge but
23 split on the lesser charge."  Even presuming that this note referred to the mayhem charge

---

[3] While the record does not indicate what the trial court's response was to this request, petitioner does not claim, nor does the court find, that there was any ambiguity in the accident instructions.

9

and not the other counts,[4] it does not indicate that the general intent instructions were unclear. To begin with, the note could have meant that it was unanimous that petitioner was not guilty of aggravated mayhem, but deadlocked as to whether he had committed simple mayhem. This would be a logical finding consistent with an accurate understanding that aggravated mayhem required a greater finding of specific intent than the general intent required for simple mayhem. In any event, the note was about *reporting* their decision on the charges, and did not raise any question about the issue of intent. After the trial court responded to the note by further instruction pursuant to CALJIC No. 17.12, the jury returned to deliberations without further question. Then, when they initially reported a deadlock on the simple mayhem charge, there was no indication that it was because of any lack of clarity in the intent instructions, and they were able to reach a unanimous verdict on simple mayhem a relatively short time later. Based on this record, there is no basis for finding that the two jury requests displayed confusion with or a lack of clarity in the intent instructions.

Petitioner also points to the prosecutor's statement in closing argument that simple mayhem is "a general intent crime. That means all you have to do is the act." When defense counsel objected, the court informed the jury that it would be instructed on the correct state of the law. RT at 1745. Although the prosecutor misstated the general intent element, this misstatement was corrected by the trial court when it issued the instructions pursuant to CALJIC No. 3.30 that, as discussed above, properly explained the general intent element of specific mayhem. "Arguments of counsel generally carry less weight with a jury than do instructions from the court." *See Boyde v. California*, 494 U.S. 370, 384 (1990). The prosecutor's statement did not cause a due process violation because it was cured by the trial court's instructions on the correct state of the law. *See id.*

Petitioner endeavors to support this argument by reference to information his

---

[4]This appears likely given that the jury later reported being deadlocked on simple mayhem.

10

attorney obtained concerning the conduct of jury deliberations. Rule 606(b) of the Federal Rules of Evidence prohibits the use of juror testimony to attack a verdict when that testimony relates to intrinsic matters, specifically, the internal mental processes by which the verdict was reached. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry."); *see also People v. Cox*, 53 Cal.3d 618 695-96 (1991) (discussing similar state evidentiary rule, Cal. Evid. Code § 1150(a)). Rule 606(b) applies to habeas proceedings under § 2254. Fed. R. Evid. 1101(e). The evidence petitioner offers is among the kinds of evidence prohibited by Rule 606(b). *See Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (pre-AEDPA). Accordingly, on habeas review under § 2254(d)(1), this court will not consider petitioner's evidence regarding the jury's deliberations in determining whether the jury instructions were deficient. *See Loscilio v. Goord*, 263 F.3d 178, 189-90 (2d Cir. 2001) (on habeas review under § 2254(d)(1), declining to consider evidence barred by Rule 606(b)).

After reviewing the jury charge and the record as a whole, the court finds no indication that the general intent instructions were deficient, let alone that they impinged upon petitioner's right to present a defense or otherwise rendered the trial fundamentally unfair so as to violate his right to due process. Accordingly, petitioner is not entitled to habeas relief on this claim.

## II.     Preservation of Evidence

Petitioner claims that the prosecutor failed to preserve a portion of the recording of his 911 call. After petitioner filed a motion in limine to suppress the tape recording of the 911 call, the trial court held a hearing at which a 911 official, Leonard Swindler, testified about the records of the call. RT at 273-98, 533-52. The call records of the call indicated that the prosecutor's tape recorded copy of the call was 18 seconds shorter than the 66-second phone call itself. RT at 276-77. Swindler explained that he made the copy of the recording for the prosecutor from a master copy, and he did not know why it had cut off the

11

1  final 18 seconds of the call. RT at 277, 284. Swindler did not notice the discrepancy at the
2  time he made the copy because he only checked the beginning of the taped copy and did
3  not listen to the whole thing. *Id.* Another copy of the master recording was also made for
4  Detective T.J. Roumph, the lead investigator in petitioner's case, but it was approximately
5  the same length as the copy given to the prosecutor. RT at 541. Roumph testified that
6  when he noticed that his copy of the call had cut off he did not request another copy
7  because in his past experience the copies of such calls are edited to exclude dead time on
8  the call. RT at 536-37. Pursuant to ordinary departmental procedures, the master
9  recording was erased after one year because no subpoena was filed seeking to preserve it.
10 RT at 286.

11       The government has a duty to preserve material evidence, i.e., evidence whose
12 exculpatory value was apparent before it was destroyed and that is of such a nature that
13 the defendant cannot obtain comparable evidence by other reasonably available means.
14 *See California v. Trombetta*, 467 U.S. 479, 489 (1984). In this case, the record indicates
15 that missing portion of the phone call was not "material" within the meaning of *Trombetta*
16 because it only included information that was already on the prosecutor's tape recorded
17 portion of the call. The trial court asked defense counsel for an offer of proof as to what
18 was missing on the tape, and defense stated that it would show that petitioner attempted to
19 render first aid to the victim, and that he was following instructions of the dispatcher. RT at
20 546-47. According to defense counsel, this would refute the victim's assertion that after the
21 shooting and before the arrival of the paramedics, petitioner was more concerned about
22 hiding the gun than about helping her. RT at 549-50.

23       After listening to the tape recordings, the trial court found, however, that the
24 recorded portion of the phone call already demonstrated that petitioner listened to and
25 followed the dispatcher's first aid instructions. RT at 548-49. Specifically, the trial court
26 quoted the following excerpt from the tape recording:

27     [T]he dispatcher is quoted as saying, "Can someone listen to me. Relax
        yourselves. I have an ambulance on its way. Is someone controlling the
28

bleeding?" Mr. Martin: "Yeah I got a towel on her hands. She got" – then blank. Dispatcher: "Tell her to relax and you relax." "Okay. Please help her, please."

RT at 548-49.) The recorded portion of the call included further statements by petitioner that he could use to support his argument that the shooting was accidental and that he was trying to help the victim in the immediate aftermath, such as his saying to the victim "I love you. Baby, I love you so much," and his telling the dispatcher that the shooting was an accident. RT at 296, 549. Thus, the information that petitioner asserts was in the missing portion of the phone call was simply cumulative of the statements that had been recorded. As such, the missing evidence was not "material" under *Trombetta* because it was readily available to petitioner by other means, and consequently the loss of the evidence did not violate petitioner's right to due process.

To whatever extent petitioner surmises that there might have been additional exculpatory material in the missing portion of the tape recording, there is no due process violation because there is no indication that the police acted in bad faith. Where missing evidence is only *potentially* useful, as opposed to actually material, there is no due process violation unless there is bad faith conduct by the police in failing to preserve evidence. *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004). The negligent failure to preserve potentially useful evidence is not enough to establish bad faith and does not constitute a violation of due process. *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997). Here, after the trial court listened to both copies of the tape recordings, it found the end of the recording "irregular" but that no evidence had been presented as to why the tape recording stopped when it did. RT at 544. In the absence of any evidence as to why it had stopped, the trial court concluded, "There's certainly no evidence of any intentional misconduct or bad faith. At best, there's an equipment failure." RT at 546.

The trial court's finding that the tape recording ended prematurely was because of equipment failure is a factual finding that cannot be overturned under 28 U.S.C. § 2254(d)(2) unless it is "objectively unreasonable in light of the evidence presented in the

13

state-court proceeding." *Miller-El*, 537 U.S. 322 at 340.  Here, there was no evidence as to why the tape had cut off prematurely.  In addition, the evidence was undisputed that the master copy was destroyed pursuant to ordinary department procedure after one year because there was no subpoena to preserve it.  Under these circumstances, there is no basis for finding that the trial court, which had the benefit of listening to the tape and the testimony of the dispatch official who made the recording, was objectively unreasonable in finding that the tape ended due to equipment failure, and not police bad faith.  Thus, even if the missing portion of the tape might have contained potentially useful information, there is no due process violation.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### III.    Prosecutorial Misconduct

Petitioner claims that the prosecutor committed misconduct by presenting the evidence of petitioner's uncharged past acts of domestic abuse against Rena F., Karen M. and Elayne F.  The trial and appellate courts found such evidence to be admissible under state law, specifically under California Evidence Code § 1109 (allowing prior acts of domestic violence to prove charged act of domestic violence) and California Evidence Code § 1101 (allowing evidence of prior bad acts to demonstrate, inter alia, intent), and that the probative value of such evidence outweighed its prejudicial effect under California Evidence Code § 352.  Resp. Ex. 22 at 7-8.  The state appellate court's conclusion that this evidence was admissible under state law is binding on this court on federal habeas review.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).

Petitioner does not here challenge the trial court's admission of such evidence; his claim is directed solely at the prosecutor, whom he claims committed misconduct in presenting this evidence.  Petitioner makes no allegation, nor is there any indication in the record, that the prosecutor did anything wrong in connection with this evidence, such as presenting it despite knowing it to be false or withholding exculpatory evidence relating to these prior bad acts.  Rather, petitioner's claim is premised solely on his belief that the

prosecutor presented this evidence because the prosecutor otherwise "lacked a strong case against petitioner." Petition at 6.  This does not amount to misconduct, let alone a violation of petitioner's constitutional rights.  The presentation of admissible evidence against petitioner at trial is precisely the role of a prosecutor.  Without indication of some sort of wrongdoing by the prosecutor, presenting evidence of petitioner's prior acts of domestic violence did not cause a violation of petitioner's constitutional rights.  Accordingly, petitioner is not entitled to habeas relief on this claim.

**IV.    Juror Misconduct**

Petitioner claims that his right to due process was violated when the jury committed misconduct during deliberations.  Following the verdict, petitioner filed a motion for a new trial on the basis of declarations of two jurors, Jurors 3 and 6.  These declarations, prepared by counsel, and using identical language, stated that two other jurors, Jurors 1 and 10, "stated repeatedly during deliberations that whether the shooting was an accident or not we should convict Mr. Martin because otherwise he could hurt someone else in the future," and that Jurors 1 and 10 "kept saying this even after another juror said that to convict Mr. Martin for that reason would be contrary to the instructions from the judge." Resp. Ex. 22 at 9.  The trial court found these allegations by Jurors 3 and 6 regarding the statements of Jurors 1 and 10 to be inadmissible under California Evidence Code § 1150(a).  *Id.*  Section 1150(a) prohibits the admission of statements made by jurors during deliberations for the purpose of showing the effect of such statements upon a juror "'either in influencing him to assent or dissent from the verdict or concerning the mental processes by which it was determined." *Id.* at 9-10 (quoting Cal. Evid. Code § 1150(a)).

The California Court of Appeal upheld the trial court's decision that the declarations were not admissible under California Evidence Code § 1150(a) based on the following reasoning:

> Here, although the declarations of Jurors 3 and 6 were drafted as objective statements about what Jurors 1 and 10 said during deliberations, the allegations merely showed that the two jurors'[1 and 10] personal opinions may have been based upon faulty reasoning or a misunderstanding or

15

> misinterpretation of the court's instructions. . . .
> We reject Martin's argument that the comments attributed to Jurors 1 and 10 should have been admitted because they raised the inference that these two jurors had implicitly agreed to disregard the court's instructions. Unlike the situations in [the California cases] relied upon by Martin, in this case any discussion regarding deterrence was not expressly prohibited by the trial court's instructions; the declarations only show that the jury may have discussed speculative, irrelevant, and/or erroneous facts or opinions. That Jurors 1 and 10 were persistent in their opinions does not raise an inference that they had deliberately agreed to disregard the court's instructions. Where, as here, the affidavit or declaration suggests deliberative error in the jury's collective mental process – confusion, misunderstanding, and misinterpretation of the law, particularly regarding the way in which the jury interpreted and applied the instructions, the declarations are inadmissible. The mere fact that such mental process was manifested in conversation between jurors during deliberations does not alter this rule.

Respondent Ex. 22 at 11-12 (internal quotations, citations and footnotes omitted).

The California Court of Appeal's decision was neither contrary to nor an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1). Where, as here, the state court only considered state law, i.e. specifically whether the evidence was admissible under California Evidence Code § 1150, the federal court conducting habeas review under § 2254(d)(1) must first ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001). Both California Evidence Code § 1150 and its federal counterpart, Rule 606(b) of the Federal Rules of Evidence, prohibit the use of juror testimony to attack a verdict when that testimony relates to intrinsic matters, specifically, the internal mental processes by which the verdict was reached. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry."); *see also People v. Cox*, 53 Cal.3d 618 695-96 (1991) (discussing Cal. Evid. Code § 1150(a)). As the state law applied by the California Court of Appeal is analogous to the applicable federal law, the state court decision was not "contrary to" federal law under 28 U.S.C. § 2254(d)(1).

Where the state court relying on state law applied a standard that was not "contrary to" the governing federal standard, the federal court conducting habeas review under § 2254(d)(1) must then ask whether the state court applied them "unreasonably" to the facts.

16

*See Lockhart*, 250 F.3d at 1232.  As discussed above, the evidence petitioner offers falls within the kind of evidence prohibited by Rule 606(b).  *See Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994).  The statements purportedly made by Jurors 1 and 10 relate to their mental processes, their reasoning and understanding (or misunderstanding) of the applicable law.[5]  Moreover, contrary to petitioner's argument, their purported statements include no agreement to deliberately misapply the law; as the state court reasonably explained, the statements, if true, at most establish that Jurors 1 and 10 "persisted" in their opinions, which is far from an agreement to misapply the law.  As the allegations offered by petitioner relate to the jurors' internal mental processes, the state court reasonably applied federal law in concluding that such allegations could not properly be considered as evidence of juror misconduct.

As the state court opinion was neither contrary to nor an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1), petitioner is not entitled to habeas relief on this claim.

**V.    Appellate Counsel**

Petitioner claims that he received ineffective assistance from his appellate counsel because appellate counsel failed to raise the foregoing claims "as they are currently presented in this habeas petition."  Petition at 6A, Traverse at 18.  The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  In evaluating such a claim, the federal court applies the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  In the instant case, appellate counsel raised two claims: that the evidence of petitioner's prior bad acts was inadmissible under state law, and juror misconduct during deliberations.  Although appellate counsel did not raise the other claims petitioner raises herein, those claims, for the reasons

---

[5] The record is not clear that Jurors 1 and 10 actually made the statements attributed to them by Jurors 3 and 6; Juror 10, for one, averred that she did not.  RT at 1944.

17

discussed above, are without merit. An appellate lawyer's failure to raise a meritless claim is neither unreasonable nor prejudicial. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (noting that one of "hallmarks of effective appellate advocacy" is weeding out weaker issues); *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding appellate counsel has no duty to raise every nonfrivolous claim requested by appellant). Accordingly, petitioner did not receive ineffective assistance of appellate counsel nor was he prejudiced by the manner in which his appeal was conducted.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March 2, 2009.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.06\MARTIN589.RUL.wpd